IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-503

Filed 6 August 2025

Hertford County, Nos. 16CRS051001-450, 16CRS000583-450

STATE OF NORTH CAROLINA

v.

FRANKLIN COY JONES

Appeal by defendant from judgment entered 2 February 2023 by Judge Cy A. Grant, Sr., in Hertford County Superior Court. Heard in the Court of Appeals 25 February 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Steven Armstrong, for the State.*
>
> *Joseph P. Lattimore for defendant.*

FREEMAN, Judge.

Defendant appeals from judgment entered upon a jury verdict of guilty on the charges of first-degree murder on the basis of felony murder and lying in wait, attempted robbery with a dangerous weapon, and discharging a weapon into an occupied vehicle causing serious bodily injury. On appeal, defendant argues the trial court (1) plainly erred by permitting excerpts of a testifying witness's written statement to law enforcement officers to be read at trial; and (2) erred by allowing a witness to answer the prosecutor's question about whether he had testified truthfully. After careful review, we conclude that the trial court did not plainly err by allowing

the statements to be read at trial and did not reversibly err by allowing the witness to testify that he had told the truth.

## I. Factual and Procedural Background

The evidence presented at trial tended to show the following. In September 2016, defendant and two friends, Bobby Askew and Nicholas Cooper, decided to rob Uday Manik, the owner of a local grocery store and gas station. On 23 September 2016, defendant and his cousin, Joy Lee, had a conversation about the planned robbery. Lee worked at Manik's store. Lee testified:

> I stopped [at Manik's store] and I saw [defendant]. He would come out, so I had automatically reached in my pocketbook. I figured he wanted some money because he was entitled—he was staying around Aulander, and I had got the money out and he had come to the car . . . He saw me go in the store and come out, and I had the money in my hand and it wasn't the money he was looking for. And then he said to me—he said he wanted to talk to me about something. And I was like of what? And [defendant] said somebody was trying to get a lick. And I was like, what's that? And then he said, well, they say your boss has money. And I told him, I said, [defendant], you should never consider doing anything somewhere where your family works. I said, you know I work there. I said he wouldn't have money like that. I said we cash checks, I said, but you know I work there, you should never—if you're talking to somebody and they're talking about you coming and robbing where you've got somebody that works—that's your family, you shouldn't even consider that.

Lee then told Manik about the conversation she had with defendant. Lee asked Manik where his gun was, and told him, "You've got somebody watching you . . . so you need to be careful." Manik subsequently started carrying the store's money in a

bag that he kept hidden on his person.

On the evening of 29 September 2016, Askew went to Manik's store to buy gas. Lee was working at the store and paid particular attention to Askew, as she was "on pins and needles" from her previous conversation with defendant. Askew returned ten minutes later to put gas in a different vehicle, and "he came back three times that night." During this time, defendant was at the home of Dominican Watford, a friend of defendant, Askew, and Cooper. Watford overheard defendant make a phone call in which defendant discussed robbing someone. Watford did not know who was on the other end of the phone call.

At around 10:00 or 11:00 that evening, Askew picked up defendant from Watford's home. Askew drove Cooper and defendant to an intersection where they knew Manik would drive by after leaving his store. Before they got out of the car, Askew placed his Hi Point 40-caliber gun on the backseat next to defendant. After defendant and Cooper got out of the car, Askew drove away. Cooper and defendant waited at the intersection for Manik, and when Manik drove up, one of them began shooting into Manik's car. Cooper and defendant then ran into the woods near the intersection without approaching Manik; they did not take anything from Manik's car or his person. Manik was shot three times and died of a perforating gunshot wound to the chest. Manik still had the store's money on his person.

After the shooting, defendant and Cooper ran into the woods near the intersection. Defendant and Cooper spent the night in a vacant house, and early the

next morning they walked along a road towards the Town of Aulander. Lee was driving on the road when she saw two men walking towards Aulander, and she thought one of them looked like defendant. Lee reported this observation to State Bureau of Investigation agent John Taylor. Agent Taylor found the two men and identified them as defendant and Cooper. Cooper got into Agent Taylor's car, while defendant continued walking.

Near the location where Agent Taylor found defendant and Cooper, investigators discovered "a black semi-automatic Hi Point 40-caliber firearm." Investigators found the gun "just inside a wood line that was closer to where [Manik's] vehicle was located." Investigators also recovered four "FC16 40-caliber S and W shell casings" and Cooper's cell phone from the scene. A forensics expert testified that the cartridge cases and bullets found at the scene "were fired from the submitted firearm," which was the Hi Point. There was not enough DNA recovered from the firearm to compare to Cooper or defendant's DNA.

On 30 September 2016, Lee provided a written statement to the police, wherein she described her relationship with defendant and what he had told her about the robbery. Later that day, police arrested defendant and Askew while they were at a party at Watford's house. On 31 October 2016, defendant was indicted on the charges of first-degree murder; robbery with a dangerous weapon; and discharging a weapon into an occupied vehicle, while in operation, causing serious injury. On 27 October 2021, Askew pleaded guilty to one count of second-degree murder. On 10 November

2021, Cooper similarly pleaded guilty to one count of second-degree murder.

Defendant's matter came on for trial on 30 January 2023. After Lee testified, Agent Taylor read Lee's written statement out loud. Relevant here, Agent Taylor read:

> Lee advised [defendant] lived with his girlfriend, but she did not know where that was. Lee described [defendant] as a "lowlife" that "hangs with lowlife." He had previously been arrested for fighting and he "hangs" with some of the boys robbing people in the town. Lee did not know the identities of those "boys."
>
> [Defendant] normally wore white shirts and jeans.
>
> Lee had never seen [defendant] with a gun, but it would not surprise her if he had one. She also had not seen Askew with a gun. Lee thought they did have guns.

Pursuant to their plea agreements, both Askew and Cooper testified against defendant. Askew testified that while at Watford's party the day they were arrested, he and defendant had a conversation about the botched robbery. Askew testified that defendant told him he had discarded the gun. Askew further testified that defendant said he "started shooting, and he kept shooting because [Manik] kept moving."

Cooper testified that defendant had the gun while they waited for Manik to arrive at the intersection. Once Manik approached the intersection, defendant started shooting into the car. Cooper dropped his phone at the intersection and then ran into the woods because he was "scared" of the gunshots, as "[s]hots was not supposed to be fired." After they were in the woods, Cooper started "panicking" and

asked defendant, "why did he do it." Cooper testified that defendant responded that "he got scared and didn't know what else to do." Cooper and defendant then began "tussling" because defendant "messed up" Cooper's life, and Cooper wanted to retrieve his phone from the intersection. Defendant apologized but told Cooper not to get his phone because "there was too many people out there."

At the end of Cooper's direct examination, the following exchange occurred:

Q: So the information that you provided them at the time [of Cooper's first interview with law enforcement] is not consistent with what you've testified to today?

A: No, ma'am.

Q: And so the information that you've testified to in court today, is that the truth, is that what happened?

[Defense Counsel]: Objection.

THE COURT: Overruled.

A: That's correct.

On 2 February 2023, the jury found defendant guilty of first-degree murder on the theories of felony murder and lying in wait. The jury found the underlying felonies to support the felony murder conviction were discharging a weapon into an occupied vehicle causing serious bodily injury and attempted robbery with a dangerous weapon. The jury also found defendant guilty of attempted robbery with a dangerous weapon and discharging a weapon into an occupied vehicle causing serious bodily injury.

The trial court sentenced defendant to life in prison without the possibility of

parole on the conviction of first-degree felony murder, with discharging a weapon into an occupied vehicle causing serious bodily injury as the underlying felony. The trial court arrested judgment on the first-degree murder conviction on the theory of lying in wait and on the conviction for discharging a weapon into an occupied vehicle causing serious bodily injury. The trial court sentenced defendant to 64–89 months imprisonment on the conviction for attempted robbery with a dangerous weapon. Defendant gave oral notice of appeal in open court after the judgment was pronounced.

## II.     Jurisdiction

This Court has jurisdiction over defendant's appeal of right from the superior court's final judgment. N.C.G.S. § 7A-27(b)(1) (2023); *see also id.* § 15A-1444(a) (2023).

## III.     Standard of Review

We review unpreserved objection to admitted hearsay statements for plain error. *State v. Hocutt*, 289 N.C. App. 562, 568 (2023). Preserved issues regarding interference with a jury's credibility determinations are reviewed de novo. *State v. Martinez*, 212 N.C. App. 661, 664 (2011); *see also State v. Clemons*, 274 N.C. App. 401, 416 (2020).

## IV.     Discussion

Defendant argues that the trial court plainly erred by not excluding hearsay evidence about defendant's character. Defendant also argues that the trial court

erred by allowing testimony about the credibility of the witness. We address each argument in turn.

## A. Corroborative Statements

Defendant first contends that the trial court plainly erred by not excluding hearsay testimony about defendant's character for violence. Specifically, defendant argues that excerpts from Lee's written statement read at trial, saying that defendant was a " 'lowlife' who had been arrested for fighting and who was part of a group that robbed people," were not introduced by Lee's testimony and therefore were inadmissible as corroborative evidence.

"Ordinarily, to preserve an [evidentiary] issue for appellate review, a litigant must raise the issue and secure a ruling from the trial court" by making a "timely objection." *State v. Reber*, 386 N.C. 153, 157 (2024) (citing N.C. R. App. P. 10(a)(1)). "Without an objection, [an] error is deemed unpreserved, and the issue is therefore waived on appeal." *Id.* Plain error, therefore,

> should be "applied cautiously and only in the exceptional case," . . . is reserved for "grave error which amounts to a denial of a fundamental right of the accused," and . . . focuses on error that has "resulted in a miscarriage of justice" or the denial of a "fair trial."

*Id.* at 158 (quoting *State v. Lawrence*, 365 N.C. 506, 516–17 (2012)). A defendant must satisfy a three-step test to show that plain error was committed below.

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that

> absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* (cleaned up). To satisfy the probable impact prong, the defendant must make "a showing that the outcome is significantly more likely than not. In ordinary English usage, an event will probably occur if it is *almost certainly* the expected outcome[.]" *Id.* at 159 (emphasis added) (cleaned up).

"Statements properly offered to corroborate former statements of a witness are not offered for their substantive truth and consequently are not hearsay." *State v. Johnson*, 209 N.C. App. 682, 692 (2011) (cleaned up). However, a "witness's prior statements as to facts not referred to in his trial testimony and not tending to add weight or credibility to it are not admissible as corroborative evidence." *State v. Ramey*, 318 N.C. 457, 469 (1986) (emphasis omitted). If the content of a corroborative statement is "far beyond the witness's in-court testimony," then the statement is inadmissible. *State v. Harrison*, 328 N.C. 678, 682 (1991). Any "new or additional information" must "strengthen and add credibility to the testimony it corroborates." *State v. Ligon*, 332 N.C. 224, 237 (1992) (cleaned up).

Here, prior to Agent Taylor's reading of Lee's written statement, defense counsel cross-examined Lee and asked questions about her written statement and what defendant had told her about the robbery.

Q: Okay. So—and he didn't say he wanted to or Bobby Askew wanted to. He just said somebody?

A: He said he knew somebody that was trying to get a quick lick and get out of town. And I said—when I said what's that, he said, well, they said your boss got money, he cashed checks.

. . .

Q: And I believe later on when you talked to Agent Taylor here and you gave him a statement, he asked you if you knew who he was referring to, correct? Do you remember him asking you that, when he said "somebody"? You didn't think he was talking about himself, did you?

A: I knew the people that he hung around, so I figured he was talking about him, and I knew—I didn't know who he was talking about, okay, but I knew who he hung around.

. . .

Q: So you were upset at that point in time that he was even talking about [the robbery]?

A: I wasn't upset, but I mean I was like—I thought I had told him and I was hoping he had listened to me.

Q: But at that point in time, again, he—according to what you told Agent Taylor you didn't think he was talking about him. You thought—I believe you said he was talking about somebody who had beaten up an autistic kid.

A: Oh, yeah, he was hanging with that guy.

Subsequently, Agent Taylor read Lee's written statement aloud to corroborate her testimony. As relevant here, Agent Taylor read excerpts stating that Lee said defendant was a " 'lowlife' that 'hangs with lowlife,' " had "previously been arrested for fighting," and " 'hangs' with some of the boys robbing people in town."

In essence, Lee's testimony, which was introduced before her written statement was read aloud, showed that: (1) defendant was considering robbing Manik; and (2) defendant associated with people who had committed violent crimes and were involved in planning robberies. Presuming without deciding that the challenged excerpts of Lee's written statement did not corroborate testimony, Lee's unchallenged testimony still supported the same idea: that defendant was a "lowlife" who associated with violent people. Thus, presuming the trial court erred in not intervening *ex mero motu* to strike the challenged testimony, defendant cannot show that absent the challenged portions of Lee's statements, the jury "almost certainly" would have reached a different outcome.

Defendant alternatively argues that trial counsel's failure to object to the excerpts from Lee's written statement that were read at trial by Agent Taylor constituted ineffective assistance of counsel. "A criminal defendant's right to counsel pursuant to the Sixth Amendment to the United States Constitution includes the right to the effective assistance of counsel." *State v. Gillard,* 386 N.C. 797, 866 (2024) (cleaned up). To demonstrate ineffective assistance of counsel, a defendant must satisfy a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

> deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord State v. Braswell*, 312 N.C. 553, 562 (1985).

"[P]rejudice under the ineffective assistance of counsel test requires a showing of 'reasonable probability' that 'but for *counsel's* unprofessional errors, the result of the proceeding would have been different.' " *State v. Lane*, 271 N.C. App. 307, 313 (2020) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "While under the reasonable probability standard the likelihood of a different result must be substantial, not just conceivable, it is something less than required under plain error." *Lane*, 271 N.C. App. at 314 (cleaned up).

Though there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,] . . . this presumption is rebuttable." *State v. Oglesby*, 382 N.C. 235, 243 (2022) (cleaned up). Even so, ineffective assistance of counsel "claims should only be decided on the merits in a direct appeal when the cold record reveals no further investigation is required[.]" *Gillard*, 386 N.C. at 867 (cleaned up). "Because the reasonableness of counsel's performance at trial is a fact-intensive inquiry, the proper course is generally to dismiss the claim without prejudice to allow for a hearing and further fact finding."

*Id.* (cleaned up).

Our examination of the "cold record" does not establish whether counsel's failure to object to the statements amounted to a failure to give reasonable professional assistance. Accordingly, we dismiss defendant's ineffective assistance of counsel claim without prejudice.

**B. Truthfulness Testimony**

Next, defendant contends that the trial court prejudicially erred by allowing Cooper to answer the prosecutor's question about whether he had testified truthfully. "The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone." *State v. Solomon*, 340 N.C. 212, 221 (1995). "[U]nder our prior case law, it is improper for . . . counsel to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony." *State v. Chapman*, 359 N.C. 328, 364 (2005); *see also State v. Warden*, 376 N.C. 503, 510 (2020) ("But concern for the fairness and integrity of criminal proceedings requires trial courts to exclude testimony which purports to answer an essential factual question properly reserved for the jury."). However, once a defendant has questioned a witness's truthfulness on cross-examination, "the defendant has opened the door, and the witness has the right to respond." *State v. Crocker*, 197 N.C. App. 358, 364 (2009).

For example, our Supreme Court held that a "trial court correctly sustained the prosecutor's objection to the question, 'Are you telling the truth?' " *State v.*

*Skipper*, 337 N.C. 1, 39 (1994) (citing *State v. Ford*, 323 N.C. 466, 469 (1988), *cert. denied*, 513 U.S. 1134 (1995), *superseded on other grounds by statute*, N.C.G.S. § 15A-2002, *as recognized in State v. Price*, 337 N.C. 756 (1994), *cert. denied*, 514 U.S. 1021 (1995)). In another case, a trial court erred by allowing a witness to answer the question, "Have you told the truth to these folks today?" *State v. Streater*, 197 N.C. App. 632, 646 (2009). However, this issue had not been properly preserved at trial and therefore had to survive the exacting plain error analysis. *Id.* at 638–40. Because there was physical evidence to support the witness's testimony, this Court held the trial court did not plainly err by allowing the witness to answer the improper question. *Id.* at 646–47.

On the other hand, our Supreme Court held that it was a prejudicial error to admit an expert's testimony about the victim's credibility when the only evidence of the defendant's guilt was the victim's testimony. *State v. Aguallo*, 318 N.C. 590, 598–99 (1986). The prosecutor asked, "After talking to . . . [the victim], did you form an opinion about whether she was believable or not?" *Id.* at 599 (alteration in original). Opposing counsel objected to the question, and the trial court overruled the objection. *Id.* Our Supreme Court held that:

> The evidence of the defendant's guilt was strong but not overwhelming. Based on the victim's testimony, a jury could reasonably conclude that the defendant was guilty[.] . . . [T]he State's case hinged on the victim's testimony and thus upon her credibility. Cross-examination of the victim raised some doubts about the victim's credibility. Because it is likely that any doubts the juror's may have had about

the victim's credibility were allayed by the [expert's] testimony that she found the victim to be "believable," we conclude that absent this testimony, there is a reasonable possibility that a different result would have been reached by the jury.

*Id.* at 599–600.

Here, at the end of Cooper's direct examination, the prosecutor asked, "And so the information that you've testified to in court today, is that the truth, is that what happened?" After the trial court overruled defense counsel's objection to the question, Cooper responded, "That's correct."

The trial court undoubtedly erred by overruling defense counsel's objection to the prosecutor's question. Binding precedent from both this Court and our Supreme Court mandates that the credibility of a witness's testimony is to be decided by the jury alone, and asking if a witness had testified truthfully violates that mandate. *See, e.g.*, *Solomon*, 340 N.C. at 221; *Streater*, 197 N.C. App. at 646. By allowing the prosecutor to ask Cooper if he had testified truthfully over defense counsel's objection—and before defense counsel "opened the door" to the truthfulness of Cooper's testimony by questioning him about his inconsistent statements—the trial court interfered with the jury's ability to make its own credibility determination about Cooper's testimony. But to obtain relief on appeal based on this preserved error, defendant must demonstrate "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (2023).

In this case, the trial court instructed the jury:

> Now, for a defendant to be guilty of a crime, it is not necessary that the defendant do all of the acts necessary to constitute the crime. If two of more persons join in a common purpose to commit a robbery with a firearm, each of them, if actually or constructively present, is guilty of the crime and also guilty of any other crime committed by the other in pursuance of the common purpose to commit a robbery with a firearm, or as a natural or probable consequence thereof.

Following this instruction, the trial court explained each charge.

Cooper's testimony was the most meaningful evidence that defendant was the shooter, since Cooper was the only other witness and there was no physical evidence to prove that defendant pulled the trigger. But the trial court instructed the jury that it could find defendant guilty of "any crime committed by the other in pursuance of the common purpose to commit a robbery with a firearm[.]" Therefore, the jury could still find that defendant was guilty of discharging a weapon into an occupied vehicle causing serious injury without deciding that he was the one who actually pulled the trigger. Even without Cooper's testimony, the evidence that defendant and Cooper joined together for the "common purpose" of robbing Manik at gunpoint was overwhelming. Further, shooting into Manik's vehicle was done in furtherance of that common purpose. Despite the error in allowing Cooper to answer that he had testified truthfully, defendant cannot demonstrate that, absent this error, there is a reasonable possibility that the jury would have reached a different result on any of the charges against him.

**C. Cumulative Errors**

Defendant alternatively argues that if "the errors individually were not sufficiently prejudicial to warrant a new trial, the cumulative effect requires a new trial[.]" Specifically, defendant contends that all identified "errors . . . impacted the live issue of who shot and killed [Manik]."

If an individual error by a trial court is not prejudicial to a defendant, "[c]umulative errors lead to reversal when 'taken as a whole' they 'deprived the defendant of his due process right to a fair trial free from prejudicial error.'" *State v. Wilkerson*, 363 N.C. 382, 426 (2009) (quoting *State v. Canady*, 355 N.C. 242, 254 (2002) (cleaned up)). In *Wilkerson*, the defendant identified approximately twenty issues on appeal, and our Supreme Court found three errors. Our Supreme Court held:

> [T]hese errors, individually or collectively, do not fatally undermine the State's case. We have reviewed the record as a whole and, after comparing the overwhelming evidence of defendant's guilt with the evidence improperly admitted, we conclude that, taken together, these errors did not deprive defendant of his due process right to a fair trial.

*Wilkerson*, 363 N.C. at 426.

And so too here. Though *who* shot Manik was heavily contested, the jury did not need to decide that defendant was the shooter in order to find him guilty of felony murder, attempted robbery with a dangerous weapon, and discharging a weapon into an occupied vehicle causing serious bodily injury. Our review of the entire record

indicates that the overwhelming evidence supporting defendant's convictions overshadows any testimony that was or may have been improperly admitted. Therefore, "taken together, these errors did not deprive defendant of his due process right to a fair trial." *Id.* at 426.

## V.    Conclusion

The trial court did not plainly err by admitting portions of Lee's written statement to law enforcement officers to be read at trial, and it did not prejudicially err by allowing Cooper to testify that he had told the truth at trial.

NO PLAIN ERROR IN PART; NO PREJUDICIAL ERROR IN PART.

Chief Judge DILLON concurs.

Judge HAMPSON concurs in result only.